Please call the next case. 315-0186 Comcast v. WFM 315-0186 Comcast v. WFM May I proceed? Thank you, Your Honor. Good morning. May it please the Court, Counsel. My name is Patrick J. Jesse, and I represent the appellant in this matter, Comcast. My argument today will focus on the Commission's decision with respect to accident and causation as being against the manifest weight of the evidence. This appeal stems from a 2-1 decision by the Commission. I emphasize that this was not a unified decision in this case, and I'd like to point out that Commissioner Ruth White, who wrote the dissent, concluded that there is, quote, nothing in this record to establish that Petitioner's work duties were or were not forceful or repetitive. That conclusion by Commissioner White is exactly the reason why the majority's decision in this matter was against the manifest weight. Didn't the claimant testify that her work duties were repetitive? I don't – the claimant never testified, I don't believe, with those exact words that they were repetitive. And I would argue even if she were to testify that they were repetitive, that's not a conclusion that she would be free to make in terms of establishing repetitive. But she's not going to say they're repetitive. She's going to testify as to what her work duties were. Sure. She did testify. She testified, and then the company's representative testified, right? Correct. Was there any dispute that her work duties increased following the sale of the business? I would not say that there's any dispute that the phone calls increased. Both agree to that. Whether the keyboarding actually increased, that was never conclusively established. If we want to look at what she testified to, she was asked on direct, and it's on page 133 and 134 of the record, I believe. But she was asked about her job duties for Comcast and on direct exam to take us through a typical call. And this is what she indicates. Well, the first thing I have to do is bring your account up. Sometimes it pops up automatically, sometimes it doesn't, and I have to enter the information. She's referring to the program that Comcast implemented at that time that would recognize your phone number and automatically populate the screen with the customer's information. She then continues on and says, I have to try and figure out why he's having this problem. Was it a non-pay? I have to switch to different screens to find out what's going on. I have to read the history, find out from each previous call. You're supposed to make notes when you're done, so then sometimes I have to read those notes and figure out what's going on. If it requires a technician to come to the house, I have to go to another screen and enter information. Let's do this. Can we agree on this? According to the record, I think it's fair. The company took over, clearly the respondent expanded geographical area service by the call center where the claimant worked. That's not in dispute, is it? It's not in dispute that the service center. According to the claimant, as a result, the expansion resulted in increased call volume and the amount of data entry required. That's not in dispute either, is it? I don't – well, with regards to the amount of data entry required, whether that – whether what she was doing when they expanded the service center, whether that increased repetitive duties, I believe it's a question of whether she was even performing repetitive duties for Comcast to begin with. We know – Okay. I understand the argument on that issue. Okay. I'm sorry. I think that's for the commission to decide. Well, it is for the commission to decide where's the evidence of the repetitive duties for Comcast in 2008. We've got an interesting fact pattern in this case where when she worked with Insight Communications from 1985 to 2008, she had two right carpal tunnel surgeries, a bilateral cubital tunnel surgeries, and a left carpal tunnel surgeries. But question, she had prior problems and prior surgeries. She had prior problems and there was a prior cumulative trauma that existed for her previous employer. And the commission addressed it. They found even though she had the prior problems and surgeries, she saw treatment for the condition and she was asymptomatic between 2006 and 2009. She was asymptomatic, Your Honor, but I believe Dr. Greening indicated in his testimony that he agreed with Dr. Sagaman that there was a mild impairment that she was still suffering from. And that partial of her numbness and tingling that she was experiencing would have still been related in part to possible scarring from previous surgeries. All right. Let me stop you there. You've been here all morning. This is very similar to the other cases. The running theme this morning seems to be aggravation of a preexisting condition. And we all recognize that as a legitimate means of recovery, even if there's preexisting conditions. So how do you respond to that argument? Because how can the commission find that she's performing repetitive activities when there's different, when the employer changed and the job duties changed? Did job duties change or did the nature of the volume change? I would argue that the job duties changed. We can, and I would agree that the nature, that the calls into the centers increased when they expanded the service area. But the job duties from when she worked at Insight where she was, where she sustained accumulative trauma changed. Comcast came in. They implicated programs for mandatory breaks. So it made it impossible for her to work over a constant period of eight hours. Well, okay. Do you have any data that shows key strokes with a prior employer and key strokes with a new employer? I do not have any data. Okay. So the idea of breaks, what's the relevancy of that? Is there a medical opinion that even though key strokes may stay the same, decrease or increase, that breaks prevent a condition from either accelerating or the creation of a condition? If I don't believe there was a medical opinion from a respondent that indicated that, what I'm getting at here is that with these changes that took place at Comcast, Dr. Greene, who testified in found causation, he had no idea about these changes. But you don't have any idea about the changes, nor do we. Or does the record have any indication of what these changes are in terms of increase, decrease, or stay the same from a prior employer? I would argue that there's no definitive evidence that the changes, I think it's exactly what Commissioner White's getting at. There is no evidence whether or not the duties remain repetitive or not between when she worked at Insight and when she worked at Comcast. Well, hang on one second. You talked about, who's Vance? Who's Vance? Isn't that somebody who works for the company? Connie Vance was the witness called to testify by a respondent. Okay, unless I'm misreading this. Klayman testified that while the tasks of each call varied, it typically required data entry with a keyboard. Vance acknowledged that data entry was involved in every call. Didn't she acknowledge that? If I would. I think she did. Well, if she acknowledged that there was some component of data entry, and I won't disagree if that's what the record says. Every call. But if we look at what her description is of what she's doing, it's not what Dr. Greening assumes in this case. She's doing constant keyboard. Because I'd just like to point out what Dr. Greening, during his testimony, he was asked about what his understanding of the job duties were at the time he saw her in 2005. And this is when she was with Insight Communications. Greening says, quote, customer service representative for Insight, have worked for that company for 20 years, eight hours a day, 40 hours a week, where his headset processes orders, which consists of processing connects and disconnects upgrades, and also on late accounts. Her activities required keyboarding through most of the day, and late account work required keyboarding and word processing and other activities. When he's asked to testify about what his understanding of her job duties were in 2009, when she was with Comcast, he says, I think we covered this earlier, but all my notes say she would work with a headset, talk on the phone, and do keyboarding activities a great majority of her time. I'm arguing specifically that I'm not trying to fault Dr. Greening in this case. But he was her treating physician before. I would argue that his descriptions that he's relying on from the history of his patient are exactly the same versus Insight and Comcast, when we know there was a change. He testified that I'm relying completely on her history. I have no idea about the nature, the extent, the duration of any of her keyboarding activities, if any of that information changed. Wait a minute, hold on a second. This is a repetitive trauma case, isn't it? It is a repetitive trauma case. So if a person has carpal tunnel syndrome because they operate a keyboard at work and has surgeries performed to relieve the carpal tunnel and becomes asymptomatic and then goes back to working on a keyboard again and the carpal tunnel flares up, are you saying that there's some significance to the fact that the use of the keyboard is the same after the surgery as it was before? The keyboard's changed between the surgeries. So what? Well, I mean, the fact of the matter is it's the repetitive use of the keyboard that causes the carpal tunnel. And in this particular case, Greening says that she used the keyboard a majority of the time, or at least she reported that she did, and he interpreted that to mean more than half of the time she's at work. And he turns around and says his causation opinion is based on the fact that she was asymptomatic before October of 2009. He's well aware of the surgeries performed in 2005. So why can't it be repetitive trauma as an aggravation of a preexisting condition? What's wrong with that? I believe Dr. Green's opinion in this case is somewhat flawed in that for him to conclude that this is a repetitive, an aggravation from doing a repetitive trauma, when he's, in my opinion, still under the understanding she's doing the same work as she did with Insight. Well, actually, wouldn't that benefit you? Yeah. Because she's saying, Clayman clearly testified that because of the expansion of the geographical area of service, she was doing more calls, you know, the volume went up and the data entry went up. Greening testified he was familiar with Clayman's work activities when he saw her on December 6th, 2009. So the benefit of the doubt would have theoretically helped your side of the case and inured to your benefit. I would just, and maybe I'm misunderstanding you, but. You seem to be saying he wasn't aware of the fact her duties had changed. He was going on her old duties. Whether they changed or not, it still would not undercut the argument of an aggravation of a preexisting condition. Provided that her job duties for Comcast were repetitive to the point where they could have aggravated it. Well, he says so. He says that she didn't have a positive Tonell sign when he saw her in February of 2007, because he would have noted that in his records, and that he opines in a reasonable degree of medical certainty that her condition December 16, 2009 was causally related to her job duties after February of 2007, because the claimant was not symptomatic in those areas when he last saw her in 2007. I would. She could have been doing exactly the same job, and she'd still have a Comcast for aggravation of a preexisting injury. So if she was, are you saying if she was doing the same exact job as she did for Insight? Yeah. Well, we know that Insight was repetitive and cumulative. I mean, that's how she saw it. Yeah. And then she said when there was a change in ownership, she did more, not less. That was the point of Justice Hudson's question. If she did the same, that would have militated, I mean. There was more phone calls. Yeah. And she said with every phone call came keyboard input. With every phone call. That was the testimony. But what I'm getting at is that, yeah, there might have been keyboarding with each phone call, but there was a program instituted with keyboard upgrades or keystrokes that only required two letters, the automatic populating of the screen. She talked about typing. What is the evidence in the record that her use of the keyboard was less after your client took over than it was before? There is an evidence that it was less, but I would also say there is an evidence that it was more. She said it was. She said with every phone call. First of all, the volume increased. We know that. And with every phone call came keyboard entry. This business about changing the keyboard, that's your testimony. That's not in the record. Does she have to prove it was more? I think she doesn't have to prove it was more anyway. Does she? I mean, if the keyboarding is causing the problem. I think she has to prove that it's a repetitive trauma in this case. So if it was the same as before, which originally caused her injury. Arguably, if it was the same as before, we know it was accumulative trauma for insight. Counsel, your time is up. Sorry. I have time. Thank you. And reply. Your Honor, this is David Hunt on behalf of Ms. Abernathy, counsel. I think counsel is correct when he says this is a manifest way of the evidence case. I think that Dr. Green was in the unique position to know exactly what he was dealing with. He treated her before. He treated her after. He was even aware of the increased volume. So he had all the facts available to him, and he rendered an opinion that the job in, as you pointed out, after it became Comcast, those duties were what caused this. Dr. Trudeau weighed in and said that he thought so. I think that when you have two opposing doctors that say A and B, it is not your job to judge those things. I think it's the commission's job. They found that Arbitrator Holland put a lot of weight on the brake, and he put a lot of weight on the keyboard. And the commission looked at that, and they said, we understand that, but we put more weight on the fact that the call center increased exponentially. Didn't Vance, the supervisor for the company itself, acknowledge that every call required some data entry? Absolutely. Every single one. Every single one. And if the calls increase, then therefore, by logic, the data entry increases. Well, except I think the opposing counsel was suggesting, although I'm not sure I don't want to speak for opposing counsel, but that there was a new program installed that reduced the number of keystrokes per call. Except that I'm not sure, Your Honor, that there's any evidence in there that that wasn't the same program. I think one thing that we're off on is, yes, Comcast bought Insight, but her job didn't change. I mean, Insight is a cable company. Comcast is a cable company. She was a customer representative. Well, I don't think anybody's arguing that her job description, that's what she does. It's a question of what does she do in that job. Did it change when Comcast was taken over as opposed to Insight or whatever? Well, we know for a fact that the volume did. I guess I don't know that the programming changed. Well, we don't. Yeah, I don't know there's any testimony to that. We don't know. Right. Exactly. Why we're wasting our time arguing this. We don't know the number of keystrokes at time A or time B. We only know that it went from a small rural area to a multi-state area where she testified that there was never, ever not people waiting in line to talk to her. So breaks or otherwise, I think that there's more than sufficient evidence in this case to support the commission's decision. Thank you, Your Honor. Thank you, counsel. Counsel, you may reply. Just a brief reply. Touching on that last aspect that whether or not the keystrokes were reduced, we know that there was a change with the programs. And it's not just the automatic populating the breaks, the two-letter keystrokes. We know that there are some measures taken to reduce arguably the repetitive nature of the job from insight versus a Comcast. What I'm specifically getting at is that the commission jumped a conclusion to find causation in that they assumed that the duties were repetitive for Comcast without ever relying on any evidence to establish definitively that you're dealing with a repetitive trauma case. And I think if we look at Greeding's testimony, it's clear that what Greeding's relying upon is a history from his client. And it's the same history she's providing from his prior knowledge when he treated this lady. Where do you get that from? Where do you get that from? He said that she told him this. Is there anything in the records of when she told him? Are we referring to Greeding? Greeding in 2009 or 2005? Well, 2009. That's what we're here to talk about. Right. Okay. I apologize. Well, in the record, I believe there was what he had indicated on his testimony was he was told that she does great keyboarding activities a great majority of the time of her work. And I believe on the ‑‑ I believe there was an intake form that she completed where she indicated she felt she had a repetitive trauma. And I would argue that she's not qualified to even ‑‑ That's not the question I asked you. Okay. Is there anything in the record that indicates when Greeding says she told me that she did keyboard input more than 50 percent of the time, he told her that, she told him that in 2005 and not 2009? Is there anything in the record that says that? Because that seems to be what you're arguing. Is there anything I would ‑‑ I'm trying to ‑‑ I think the answer to that question is no. Well ‑‑ There is absolutely nothing in the record that suggests that Greeding is talking about something she told him years before. And maybe I came out wrong how I was saying it. But I was merely getting at if we ‑‑ comparing what he testified to as his understanding of her prior job duties and what he's testifying to as what her job duties are now. And there's a portion where he says I'm merely relying on her history. I have no idea what the nature and extent and duration of ‑‑ He also said a significant amount of her work involves keyboarding. Is that ‑‑ can anybody dispute that? That her work involves keyboarding? Is there a dispute? The work involves keyboarding, whether it's significant, whether it's repetitive, whether it's the same as what she was doing with insight, I'd argue is no. Why is what she was doing with insight even relevant? Because the key ‑‑ She had carpal tunnel syndrome. She was operated on for it. She then continues on with a job that requires her to do keyboarding. The question is, was the keyboarding that she was required to do after her carpal tunnel surgery a cause of her current condition? Yes or no? And if it's yes, she recovers. If it's no, she doesn't. And the commission said the answer was yes because of Grading's testimony. That's the whole case in a nutshell. And there are no ifs, ands, buts. Was it the same as before or after? It's not relevant. The question is, did the keyboarding between 2005 and 2009 constitute a cause of her condition? That's all it amounts to. Was it repetitive and was it a cause? She says it was. Did it frequently? And Grading says it was a cause. Well, I would just, and I know I'm probably running out of time here. Isn't it basically you're saying Grading's opinion is not based, in your view, upon the activities that she was engaged in at the time she claims she was having this injury? Yes, Your Honor. That's exactly what I'm trying to get at. And I would just ask that the court reverse the majority's decision in this case with respect to accident and causation and the award of past and prospective medical care. Thank you for allowing me to be here. Thank you, counsel, for being here. Thank you both, counsel, for your arguments in this matter. We'll take them under advisement at written disposition. Thank you. The court will stand and recess until 1.30.